**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. MJ-23-02855-TUC-EJM |
| Plaintiff, | |
| v. | ORDER |
| Raphel Crosby, | |
| Defendant. | |

Pending before the Court is a Motion to Determine Competency filed by defense counsel in the above captioned matter. (Doc. 19.) This Court granted the motion and ordered that the defendant be evaluated by a licensed or certified psychiatrist or psychologist. (Doc. 24.)[1]

**I.  FACTUAL BACKGROUND**

The defendant was evaluated by George Goldman, Ph.D., on August 31, 2023. (Ex. 4 at 1.[2]) Dr. Goldman issued a report dated September 18, 2024, in which he concluded that the defendant was not competent to proceed with future court proceedings. (*Id.* at 2.) Dr. Goldman noted that the defendant exhibited indications of delusional thinking and visual hallucinations, was not oriented to time, place or self, and his insight and judgement

---

[1] The defendant is charged with eight misdemeanor offenses, to wit, Indecent Exposure. The maximum sentence for each count is six-months in custody. The offenses were allegedly committed at the United States Penitentiary in Tucson, Arizona, where the defendant is serving a lengthy federal sentence.

[2] Defendant's Exhibit 4 to the December 5, 2024, Competency Hearing—Goldman's Report 8/31/2023. *See* Exhibit List (Doc. 46).

are very poor. (*Id.* at 1.) He further noted that it was difficult to determine if the defendant's short-term or long-term memory was intact. (*Id.*) Dr. Goldman diagnosed the defendant with "Schizophrenia, Continuous with Severity 4." (*Id.* at 2.) Dr. Goldman recommended that the defendant "should be seen for a medical evaluation, and he should be provided with the opportunity to receive ongoing, consistent individual counseling." (Ex. 4 at 2.)

At a status hearing on October 27, 2024, defense counsel and government counsel stipulated to Dr. Goldman's conclusion that the defendant was not competent. (Minute Entry 10/27/2024 (Doc. 27).) The government moved to have the defendant participate in a competency restoration program at a Federal Medical Facility. *(Id.)* The Court granted that motion. (*Id.*) The Court issued its October 27, 2024, Order of Commitment (Doc. 28) by which the defendant was committed to the custody of the Attorney General to be hospitalized in a suitable facility for up to four months.

The defendant was hospitalized at the U.S Medical Center for Federal Prisoners in Springfield, Missouri, and went through a competency restoration program. (*See* Ex. 2.[3]) In a report dated June 26, 2024, Dr. Sarah Burton concluded that the defendant was competent and will continue to remain competent for the duration of his legal proceedings. (*Id.* at 20.) Dr. Burton opined that the defendant "does not currently exhibit symptoms of a mental disease or defect that impair his factual or rational understanding of the charges and proceedings against him, or his ability to assist properly in his defense." (*Id.*) Dr. Burton diagnosed the defendant with Antisocial Personality Disorder and substance abuse disorders. (*Id.*) Dr. Burton also noted that the defendant was "malingering psychotic symptoms and memory deficits." (*Id.*) As a result, antipsychotic medication was not recommended or prescribed." (*Id.*)

At a status hearing on August 22, 2024, defense counsel advised the Court that he continues to have concerns about the defendant's competency and is not ready to stipulate

---

[3] Government's Exhibit 2 to the December 5, 2024, Competency Hearing—Bureau of Prisons ("BOP") Competency Report. *See* Exhibit List (Doc. 46).

- 2 -

1 that the defendant is competent. (Minute Entry 8/22/2024 (Doc. 36).) On August 26, 2024, the Court ordered that Dr. Goldman conduct another competency evaluation of the defendant. (Second Order to Determine Mental Competency 8/26/2024 (Doc. 37).) Dr. Goldman conducted his second competency evaluation of the defendant on August 29, 2024. (Ex. 5 at 1.[4]) Dr. Goldman issued a report in which he concluded that the defendant remains incompetent to proceed with further court proceedings. (*Id.* at 1.) Dr. Goldman noted that during the evaluation, the defendant "was grossly disorganized in his thinking, delusional with bizarre content, and consistently distracted himself." (*Id.* at 2.) Dr. Goldman further noted that many aspects of the defendant's "odd, idiosyncratic responses were consistent with what was observed last year." (*Id.*) Dr. Goldman opined that the defendant "is seriously mentally ill and that he is not capable of fully understanding the process of court proceedings and would be unable to aid in his own defense." (*Id.*)

Because of the inconsistent conclusions reached by Dr. Goldman and Dr. Burton, the Court held a competency hearing on November 7, 2024, and December 5, 2024. (Docs. 42 and 44.) Dr. Burton testified on November 7, 2024, and Dr. Goldman testified on both dates. Their testimony is set forth below.[5]

**Dr. Burton**

*Direct Examination:*

Dr. Burton started doing competency examinations as a graduate student at the Metropolitan Correctional Center in Chicago in 2021. (Hr'g Tr. 11/7/2024 (Doc. 43) at 4.) From 2014 to 2015, she did her psychology internship at the Federal Medical Center in Springfield. (*Id.* at 8.) After obtaining her doctorate in psychology, she continued to work at the Springfield facility. (*Id.*)

The defendant was at the Springfield Medical Center for four (4) months. (*Id.* at 15.) The Springfield facility has a 24-hour nursing staff and three (3) to four (4) unit

---

[4] Defendant's Exhibit 5 to the December 5, 2024, Competency Hearing—Goldman's Report 8/29/2024. *See* Exhibit List (Doc. 46).

[5] The parties stipulated to the qualification of both doctors.

1 officers who interact with patients. (*Id.* at 18–19.) Dr. Burton and other staff members
2 observed the defendant to gather as much information as possible and look for
3 consistencies and inconsistencies in the defendant's self-report and behavior. (Hr'g Tr.
4 11/7/2024 (Doc. 43) at 16.) It is easier for individuals to feign psychotic symptoms for
5 short periods of time. (*Id.*) However, it is more difficult to feign symptoms for twenty-
6 four (24) hours a day for four (4) months. (*Id.*)

7 Dr. Burton sees her patients weekly during rounds. (*Id.* at 17.) Some conversations
8 are more cursory, and others are lengthy. (*Id.*) She also meets patients for clinical and
9 forensic interviews, which are usually an hour or more. (Hr'g Tr. 11/7/2024 (Doc. 43) at
10 17.) Doctors also try to meet with patients for psychological testing. (*Id.*) The nurses
11 complete weekly documentation of their interaction with patients. (*Id.* at 20.) The patients
12 also attend competency restoration group sessions where they interact with clinical staff.
13 (*Id.* at 17–18.)

14 Malingering is defined as "the intentional production of false physical or
15 psychological symptoms or the exaggeration of genuine psychological or physical
16 symptoms, specifically motivated by some sort of external incentive." (*Id.* at 10.)
17 Malingering is relatively rare in the competency restoration setting. (Hr'g Tr. 11/7/2024
18 (Doc. 43) at 9.) However, malingering is more prevalent in settings where individuals are
19 undergoing some sort of forensic evaluation as part of the criminal process. (*Id.*) A study
20 reported that nine percent of individuals who are referred for an evaluation in that setting
21 were found to be malingering. (*Id.*)

22 A diagnosis of malingering is not made lightly because it has a negative connotation.
23 (*Id.* at 21.) That diagnosis essentially follows the patient and if the diagnosis is erroneous,
24 "it could be carried forward by future clinicians" and result in the patient not receiving
25 needed treatment. (*Id.*)

26 Dr. Burton concluded that the defendant was malingering because he was
27 fabricating symptoms. (Hr'g Tr. 11/7/2024 (Doc. 43) at 10.) Dr. Burton reached that
28 conclusion based on her interactions with the defendant, psychological testing, and

1   behavioral observations, as well as those of other staff members. (*Id.* at 23.) Dr. Burton
2   also reviewed the defendant's 2018 Presentence Report, some court documents related to
3   the instant case, a 2023 pre-trial report, Dr. Goldman's 2023 evaluation report, and the
4   defendant's medical/psychological records generated during his time in federal custody.
5   (*Id.*)

6         Dr. Burton's malingering diagnosis was based, in part, on changes in the defendant's
7   self-report of his symptoms. (*Id.* at 24.) For example, at one point he spoke "about Timmy
8   talking to him," and then at another point he mentioned "Frankie." (*Id.*) Even though he
9   often said that he never heard voices, he reported hearing voices three times during the
10  restorative period. (Hr'g Tr. 11/7/2024 (Doc. 43) at 24.) He mentioned "Baby King Kong,
11  Jr." on two occasions during the restorative period, "which was inconsistent with how he
12  was described during his interaction with Dr. Goldman when he was quite insistent and
13  adamant about being called Baby King Kong, Jr." (*Id.* at 25.)

14        The defendant's self-report of symptoms became more bizarre over time, which is
15  consistent with someone who is malingering. (*Id.*) For example, the defendant gave Dr.
16  Burton a note prior to a scheduled interview advising her that he did not want to do the
17  interview because something was wrong with her laptop computer. (*Id.* at 25–26.) The
18  note advised Dr. Burton not to mention his concern about the laptop out loud because
19  people would tell him that he is crazy. (*Id.* at 26.) She offered to do the interview using
20  handwritten notes, but the defendant declined to participate. (Hr'g Tr. 11/7/2024 (Doc. 43)
21  at 26.) Additionally, the defendant told Dr. Burton that "he was writing a letter to an
22  Arabian sheik in Arabic purportedly, which was an entirely new type of behavior." (*Id.*)
23  He also told Dr. Burton that "he was Michael Jordan's cousin, which was an entirely new
24  statement." (*Id.*)

25        The bizarre information in self-reports were not consistently raised during the
26  restorative period, which is also relevant to a malingering diagnosis. (*Id.*) Because
27  psychosis is a chronic disorder, "it would be unlikely for somebody who's not guarded to
28  only speak of a specific symptom one time and for it never to come up otherwise." (*Id.* at

1    26–27.) It would also be rare "to not see consistent behavioral markers that corroborate
2    those symptoms." (Hr'g Tr. 11/7/2024 (Doc. 43) at 27.)

3          Malingering is easier to do for short periods of time, at least with respect to obvious
4    symptoms. (*Id.* at 29.) It is not easy to feign subtle symptoms, such as consistently flat or
5    blunted affect, odd affect, poor hygiene, catatonia, confusing speech, or consistently
6    bizarre and confusing behavior. (*Id.*) The defendant did not maintain any of these subtle
7    symptoms during the restorative period. (*Id.*) He did not appear to be distracted by or
8    responding to hallucinations and did not show signs of paranoia. (*Id.* at 30.)

9          There were not significant indications that the defendant experienced disorganized
10   behavior. (*Id.* at 32.) "His behavior was goal oriented." (Hr'g Tr. 11/7/2024 (Doc. 43) at
11   30.) Although he appeared distracted at one group restoration class, "this brief
12   distractibility didn't impair his participation or concentration on the group session in any
13   noteworthy way." (*Id.*) The defendant's behavior and interactions were not perfect, but
14   he was able to remember the individuals that he saw frequently, he got along well with the
15   unit officers, and he "was able to build an appropriate level of trust and rapport with staff
16   members from many different disciplines." (*Id.* at 30–31.)

17         There were a variety of inconsistencies in certain things the defendant reported. (*Id.*
18   at 31.) For instance, he frequently spoke about his time at the U.S. Penitentiary in Tucson,
19   "yet would then state that he remembered nothing about the alleged offense behavior."
20   (*Id.*) He seemed to recall things in a self-serving manner. (Hr'g Tr. 11/7/2024 (Doc. 43)
21   at 33.) Although the defendant claimed he could not recall his "bad behavior" at the
22   penitentiary, "he was able to recall in great detail his perceived mistreatment at the hands
23   of staff members at that facility." (*Id.*) He also recognized a staff psychologist at
24   Springfield who had been on staff at the Tucson Penitentiary. (*Id.* at 35.) He jokingly
25   asked if the psychologist was following him. (*Id.*) As a result, it is very difficult to believe
26   that someone could have selective memory loss for the same period of time. (*Id.* at 33.)

27         The defendant recalled Dr. Goldman (although he called him Dr. Goldberg) and
28   seemed to understand the results of Dr. Goldman's evaluation. (Hr'g Tr. 11/7/2024 (Doc.

43) at 34.) He "even talked about the options that are on the table for him essentially in terms of a plea agreement, despite his vacillating report that he doesn't even know what a plea agreement entails." (*Id.*) He also mentioned that a conviction would require him to register as a sex offender. (*Id.*)

The defendant's PSR and medical records did not reflect a history of mental health issues prior to the onset of the instant case. (*Id.* at 36.) There was a reference to the defendant hearing voices, but he reported it as an internal dialogue as a result of minimal peer interaction while he was in isolation or secured housing status. (*Id.*) "But, otherwise, there were no behavioral indicators or even apparent self-report of symptoms of psychosis." (Hr'g Tr. 11/7/2024 (Doc. 43) at 36.) That absence of indicators is prior to the instant case and the defendant's meeting with Dr. Goldman is noteworthy because it "suggests there may be some sort of motivation or incentive for that behavior." (*Id.* at 36–37.) Additionally, the onset of psychosis later in life, though not impossible, is unusual. (*Id.* at 37.) Psychosis typical develops in males in the late teens or early twenties. (*Id.*)

A Structured Interview of Reported Symptoms test was administered to the defendant. (*Id.* at 38.) He was in "the definite feigning range on two of [the] scales," one which measures rare symptoms and another which measures reported versus observed symptoms. (Hr'g Tr. 11/7/2024 (Doc. 43) at 38.) On the Validity Indicator Profile test, the defendant evidenced "irrelevant responses, suggesting maybe a careless response style." (*Id.* at 39.) Although additional testing would have been helpful, the defendant "began limiting his cooperation in the evaluation process." (*Id.*)

*Cross-examination:*

Dr. Burton has made a malingering diagnosis five to ten times during the course of her career. (Hr'g Tr. 11/7/2024 (Doc. 43) at 42.) The diagnosis that the defendant is malingering was based on testing, review of his prior history, his self-report of symptoms, and observation of his behavior. (*Id.*)

Over the course of the four-month evaluation period, Dr. Burton saw the defendant weekly during rounds. (*Id*. at 43.) In general, Dr. Burton's interactions during rounds last

between five (5) and twenty (20) minutes, depending on how talkative the patient is and/or how much information she needs to obtain from the patient. (*Id.*) With respect to the two interviews that the defendant agreed to participated in, one interview was 85 minutes and the other was 105 minutes. (*Id.* at 43–44.)

Dr. Burton has not had any interaction with the defendant since he left Springfield. (Hr'g Tr. 11/7/2024 (Doc. 43) at 45.) As a result, she cannot opine on the defendant's present symptoms. (*Id.*)

With respect to determining if someone is malingering, it is "difficult to prove that something doesn't exist[.]" (*Id.* at 46.) It is possible that the symptoms that Dr. Burton attributed to malingering could be genuine symptoms of a mental health condition. (*Id.* at 45.) For example, it's possible that the defendant has experienced hallucinations. (*Id.*) Dr. Burton considered that the defendant was presenting with genuine symptoms of psychosis because he reported auditory hallucinations at one point, stated that he was paranoid, made bizarre statements, and Dr. Goldman diagnosed him with schizophrenia and reported observing a variety of bizarre symptoms during his evaluation. (Hr'g Tr. 11/7/2024 (Doc. 43) at 46.)

Dr. Burton observed behavior that would support Dr. Goldman's diagnosis. (*Id.*) For instance, the defendant "referenced hearing the voice of Timmy," and on two occasions "he reported believing his name to be Baby King Kong, Jr." (*Id.* at 47.) The defendant also claimed that a nurse had tampered with his medication. (*Id.*)

Dr. Burton does not believe that the defendant had problems with his memory. (*Id.*) Although the defendant said that he had memory problems, that claim "was not supported by observations of his actually memory abilities and his daily functioning." (Hr'g Tr. 11/7/2024 (Doc. 43) at 47.)

The defendant's medical records reflect that he was "assessed for suicide risk on upwards of 20 occasions." (*Id.* at 50.) He also "engaged in some head banging behavior and perhaps cutting during his time at Tucson." (*Id.*) This behavior could be the result of a mental defect or illness. (*Id.* at 51.)

1  When the defendant arrived at Springfield, he initially said that he wanted to be addressed as Baby King Kong, Jr. (*Id.* at 53.) He also told Dr. Goldman that at the beginning of his second evaluation. (Hr'g Tr. 11/7/2024 (Doc. 43) at 54.) Dr. Goldman's report of his second evaluation reflects that the defendant did not recall his first meeting with Dr. Goldman. (*Id.* at 53.) It is possible that when the defendant arrives at a new location with unknown people, he wants to let them know that his name is Baby King Kong, Jr. (*Id.* at 54.)

The defendant was prescribed medication for depression based on his reported symptoms, but Dr. Burton did not diagnose him with having a major depressive disorder. (*Id.* at 56.) The defendant had been previously diagnosed with antisocial personality disorder, which is "a pervasive and problematic pattern essentially of how an individual interacts with the world." (*Id.* at 57.) More specifically, this disorder "means that an individual has a pattern of engaging in behavior that is essentially breaking the rules or violating the rights of others." (Hr'g Tr. 11/7/2024 (Doc. 43) at 57.) It includes a variety of character traits, such as "a lack of remorse, impulsivity, irresponsibility, and engaging in behavior that's grounds for arrest." (*Id.*) "[A]ntisocial personality disorder is distinct from a psychotic disorder." (*Id.*) Personality disorders, for the most part, do not impact a person's competency because they are not "typically interpreted as a severe mental illness that would meet the criteria of a mental disease or defect." (*Id.* at 58.)

It is "possible that individuals can decompensate after their arrest" and incarceration, especially for individuals who are in isolation or secured housing. (*Id.* at 59.) The defendant spent a significant amount of time in the "special housing unit due to his behaviors." (Hr'g Tr. 11/7/2024 (Doc. 43) at 60.)

Cooperation was an issue with the defendant. (*Id.*) He was quite cooperative at the beginning of the restorative period, but then began to withdraw and disengage from the evaluation process toward the end. (*Id.*) Lack of cooperation is a reason to consider malingering as a diagnosis. (*Id.*)

*Re-direct examination:*

Dr. Burton's opinion is that the defendant is competent and was malingering when he was at Springfield. (Hr'g Tr. 11/7/2024 (Doc. 43) at 62.) Dr. Goldman's report of his 2024 evaluation of the defendant does not change her opinion that the defendant is competent and continues to malinger. (*Id.*)

### Dr. Goldman

*Direct examination:*

Dr. Goldman has examined individuals for competency for legal proceedings for forty years. (Hr'g Tr. 11/7/2024 (Doc. 43) at 76.) In some cases, competency is "chronic and clearly permanent[.]" (*Id.*) But in other cases, competency is fluid concept. (*Id.* at 76–77.) A person who is incompetent can have moments of clarity. (*Id.* at 77.)

Dr. Goldman examined the defendant to determine if he was competent, specifically, if he could contribute to his own defense. (*Id.* at 78.) Dr. Goldman's intent during both evaluations was to administer a personality test. (Hr'g Tr. 11/7/2024 (Doc. 43) at 78.) However, it quickly became apparent that the defendant would not be able to successfully complete the test given his distractibility and hesitation. (*Id.*) Dr. Goldman's impression of the defendant was that he was anxious, distracting, distracted, somewhat agitated, and had difficultly staying in one spot. (*Id.* at 79.) It became apparent "that he was a disturbed individual." (*Id.*) He had a peculiar name as to how he wanted to be addressed, distracted himself significantly during the evaluations, and said bizarre things. (*Id.*) Dr. Goldman does not believe that the defendant has a problem with his memory. (Hr'g Tr. 11/7/2024 (Doc. 43) at 80.) He just refused to address certain things either by not responding or saying, "I don't know." (*Id.*)

Both of Dr. Goldman's evaluations of the defendant lasted about two hours. (*Id.*) The defendant seemed a bit less anxious as the second evaluation progressed, but he seemed a little more agitated as well. (*Id.* at 81.) The defendant introduced himself again as Baby King Kong, Jr. at the second meeting. (*Id.*) The defendant said he did not recall meeting Dr. Goldman before. (Hr'g Tr. 11/7/2024 (Doc. 43) at 81.) After the first

1    evaluation, Dr. Goldman diagnosed the defendant with schizophrenia, which is a severe
2    thought/psychotic disorder "characterized by disorganized thought, often delusions, often
3    hallucinations, and a frequent inability to make a judgment regarding what's real and what
4    isn't." (*Id.* at 82.) Although the defendant never said he was having visual hallucinations,
5    he often looked away to a different part of the office as if he was looking at something.
6    (*Id.* at 83.) He did speak about auditory hallucinations. (*Id.*) Dr. Goldman cannot say that
7    the defendant did not benefit from the restoration program, but his diagnosis remained the
8    same after his second evaluation. (*Id.* at 84–85.)

9    Malingering is a clinical judgment call. (Hr'g Tr. 11/7/2024 (Doc. 43) at 88.) There
10   is no test that definitively can identify if someone is malingering. (*Id.*) Moreover, there is
11   a significant false negative/positive on the tests that are usually administered. (Hr'g Tr.
12   12/5/2024 (Doc. 49) at 18.) Additionally, there is a difference between feigning and
13   malingering. (Hr'g Tr. 11/7/2024 (Doc. 43) at 85.) The main difference is that
14   "malingering is clearly misrepresenting yourself for an external benefit." (*Id.*) In the
15   defendant's case, the benefit would be not facing the charges. (*Id.*) Feigning is an
16   exaggeration of existing symptoms with no apparent benefit. (*Id.*) Dr. Goldman does not
17   believe the defendant is malingering. (*Id.* at 90.) He believes the defendant was "genuine
18   in presenting himself" and was not "purposefully attempting to misrepresent who he was
19   or what he was thinking and what he was feeling." (Hr'g Tr. 11/7/2024 (Doc. 43) at 91.)
20   If anything, the defendant is feigning, not malingering. (*Id.* at 85.) Feigning can be
21   intentional. (*Id.* at 86.) But, if the defendant is intentionally feigning, it is "another
22   indication of his mental illness." (*Id.*)

23   A person's lack of cooperation during testing can be the result of a mental illness or
24   defect. (*Id.* at 89.) Lack of cooperation can either be purposeful or cooperation is being
25   disrupted by being challenged. (Hr'g Tr. 11/7/2024 (Doc. 43) at 89.) Dr. Goldman did not
26   feel that the defendant was uncooperative during their meetings; he was just agitated and
27   very distracted. (Hr'g Tr. 12/5/2024 (Doc. 49) at 18.)

28   Dr. Goldman does not believe that the defendant is competent. (Hr'g Tr. 11/7/2024

1  (Doc. 43) at 86.) When asked specifically about courtroom proceedings, the defendant
2  said, "the court is there to punish you." (*Id.*) When asked if the process included coming
3  to the truth, the defendant mumbled something that was unintelligible. (*Id.* at 86–87.) The
4  unintelligible mumbling occurred a number of times during the evaluations; the defendant
5  seemed to be having internal conversations. (*Id.* at 87.) Dr. Goldman's opinion is that the
6  defendant would not be able to contribute to or help in his defense or make important
7  decisions like going to trial or pleading guilty. (*Id.*) His opinion is based on the defendant's
8  general behavior of distracting himself in the middle of speaking, going on irrelevant
9  tangents, and his general agitation that arose when pressed to discuss the charges. (Hr'g
10 Tr. 11/7/2024 (Doc. 43) at 87–88.)

Dr. Goldman thinks that consistent individual and group treatment could improve the defendant's mental health. (*Id.* at 92.) Dr. Goldman believes that a medical evaluation is required to determine if the defendant would benefit from medication. (*Id.*) He also believes that there is a reasonable probability that the defendant can be restored to competency within the foreseeable future. (*Id.*)

*Cross-examination:*

Dr. Goldman is not sure if he has ever testified on behalf of the prosecution. (Hr'g Tr. 12/5/2024 (Doc. 49) at 4.) He has testified at competency hearings "[a] handful" of times. (*Id.*)

Dr. Goldman did not administer the SIRS-2 or any other test on the defendant to assist in determining if he was malingering. (*Id.* at 7–8.) He relied on his judgment which led him to conclude that the defendant may possibly be feigning, but not malingering. (*Id.* at 8.) Dr. Goldman agreed that a defendant in a criminal case could have a motivation to malinger. (*Id.* at 12.)

Dr. Goldman believes he was able to build a fair amount of rapport with the defendant. (Hr'g Tr. 12/5/2024 (Doc. 49) at 11.) He is not suggesting that the BOP evaluators did not build a similar rapport. (*Id.* at 12.)

Dr. Goldman agreed that it would be more difficult to successfully malinger if a

- 12 -

1 person spent a longer period of time with a mental health professional. (*Id.* at 20.)
2 However, he noted that individuals who suffer from a serious mental health disorder will
3 function normally during certain periods of time; they are not always demonstrating
4 symptoms. (*Id.* at 22.)

5     ***Re-direct examination:***

6     Dr. Goldman's decision not to administer a test to assess malingering is accepted in
7 his field of practice. (Hr'g Tr. 12/5/2024 (Doc. 49) at 14.) He did not administer any tests
8 because he did not believe the defendant would have been able to successfully complete
9 any of the relevant tests. (*Id.*)

10     Dr. Goldman agreed with Dr. Burton that psychotic symptoms typically begin in
11 mid to late adolescence. (*Id.* at 17.) As a result, it would be unusual if this was the first
12 time the defendant experienced psychotic symptoms. (*Id.* at 16–17.) But Dr. Goldman
13 added that he does not know what the defendant "was like from 15-18. There may have
14 been some indication of these kinds of symptoms." (*Id.* at 17.)

15     The defendant did not seem to have a motivation to fool Dr. Goldman. (Hr'g Tr.
16 12/5/2024 (Doc. 49) at 19.) Dr. Goldman acknowledged that he is "not beyond being
17 fooled," but it did not seem to him that the defendant "was in any way behaving in a
18 premeditated manner to give [him] a false impression of who he was." (*Id.*) Dr. Goldman
19 believes that the defendant's intelligence level is below average, which would add to the
20 difficulty of him malingering. (*Id.* at 22.)

21 **II. DISCUSSION**

22     ***A. Legal Standard***

23     "A defendant is incompetent to stand trial if the court finds 'by a preponderance of
24 the evidence that the defendant is presently suffering from a mental disease or defect
25 rendering him mentally incompetent to the extent that he is unable to understand the nature
26 and consequences of the proceedings against him or to assist properly in his defense . . . .'"
27 *United States v. Frank*, 956 F.2d 872, 874 (9th Cir. 1991) (*quoting* 18 U.S.C. § 4241(d)).
28 The government bears the burden of demonstrating that the defendant is competent to stand

trial. *Frank*, 956 F.2d at 875 (citations omitted); *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991).

The Supreme Court of the United States set forth the test for determining competency to stand trial in *Dusky v. United States*, 362 U.S. 402 (1960). In that case, the Supreme Court held that:

> [I]t is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'

*Dusky*, 362 U.S. at 402 (alterations after the first in original) (citations omitted). The Supreme Court subsequently noted that requiring a criminal defendant to "be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993).

A court's determination of competency is a factual, rather than a legal determination. *See United States v. Mackovich*, 209 F.3d 1227, 1231–32 (10th Cir. 2000). In determining competency, a court "may rely on a number of factors, including medical opinion and the court's observation of the defendant." *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998); *see also United States v. Mendez-Sanchez*, 563 F.3d 935, 947 (9th Cir. 2009) (noting "[a] court considers the defendant's irrational behavior, his demeanor in court, and any prior medical opinions"). In cases with multiple experts, a district court may find a defendant competent by adopting the findings of one expert and discounting the contrary findings of another. *Miles v. Dorsey*, 61 F.3d 1459, 1472–74 (10th Cir. 1995).

**B.    Analysis**

The Court is faced with the always difficult task of assessing which mental health professional to side with. This task is made more difficult in the case at hand because both Dr. Burton and Dr. Goldman are experienced mental health professionals, were credible, and provided thorough explanations for their inconsistent diagnoses.

Dr. Burton did not specifically articulate why she believed that the defendant

understood the charges against him and can assist in his defense. The focus of Dr. Burton's testimony was that the defendant was malingering, and for that reason, understands the charges against him and can assist his attorney in his defense.

Dr. Goldman disagreed that the defendant was malingering; at best, he may have been feigning his symptoms. During his evaluations, Dr. Goldman could not fully explore whether the defendant understood the charges or can assist in his defense because the defendant's severe mental health symptoms (e.g. being distracting, distracted, agitated, and appearing to see visual hallucinations) prevented any meaningful conversation on those subjects.

The Court has no doubt that Dr. Burton was conscientious and careful in making her malingering diagnosis. In fact, she testified to negative consequences that can result from a misdiagnosis of malingering. However, Dr. Burton never addressed the concept of feigning, which is exaggerating mental health symptoms that do exist, as opposed to essentially making up those symptoms. That failure is significant because Dr. Burton admitted that the defendant's behavior and thoughts could be, at least in part, the result of a mental health condition and she observed behavior that would support Dr. Goldman's diagnosis.

Moreover, Dr. Goldman explained that a person who is mentally ill can function normally at times; they are not always experiencing symptoms. Dr. Burton did not address that point in her report or testimony. Thus, the fact that the defendant got along well with unit officers and built an appropriate level of trust and rapport with staff members does not mean that he is not suffering from a serious mental health issue that impacts his competency.

The Court is not concluding that the defendant was not competent when he left Dr. Burton's care at Springfield. However, both doctors agreed that competency is a fluid concept that can change over time and can be impacted by the setting (especially a custodial setting) in which a person resides. And Dr. Burton obviously cannot opine of if the defendant decompensated since he left Springfield, which she admitted can happen. By

contrast, Dr. Goldman evaluated the defendant recently and was unwavering in his opinion that, even if the defendant benefited from the restoration program, he is not currently competent. Additionally, defense counsel is of the same opinion based on his many conversations with the defendant over the course of his lengthy representation. Finally, at the many hearings held on the competence issue, the defendant has had a vacant look and appears to nod off. Thus, for what it's worth, the Court's observations of the defendant are consistent with the opinions of Dr. Goldman and defense counsel.

All of that said, Dr. Goldman is also of the opinion that there is a reasonable probability that the defendant can be restored to competency within the foreseeable future. Dr. Goldman believes that consistent individual and group treatment could improve the defendant's mental health, and that a medical evaluation is required to determine if the defendant would benefit from medication. The treatment component will again be addressed at a BOP Medical facility. The Court hopes that the medical evaluation component will be addressed there as well.

### C. Conclusion

The Court finds by a preponderance of the evidence that the defendant is not presently competent to stand trial.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Pursuant to 18 U.S.C. § 4241(d) the defendant is committed to the custody of the Attorney General to be hospitalized in a suitable facility for a reasonable period of time, *not to exceed four months*, as is necessary to determine whether there is a substantial probability that in the foreseeable future the defendant will attain the capacity to permit the proceedings to go forward. The four months shall commence on the date the defendant arrives at the facility.

2. The United States Marshal shall:

    a. Promptly coordinate with the Bureau of Prisons to effectuate this Order and arrange transportation of the defendant to the designated facility, and transmit the U.S. Marshal's Medical Study Timeline to the Honorable Eric J. Markovich within

fourteen (14) days.

        b. If the psychologist or psychiatrist finds the defendant to be competent and issues a certificate of competency, promptly transport the defendant back to the District of Arizona without further Order of this Court, and notify the Court and counsel for both parties when the defendant is back in the District.

    3. The Attorney General or his agent shall:

        a. At the end of the defendant's commitment, prepare and submit a written report pursuant to 18 U.S.C. § 4247(b) and (c). This report shall include the name and dosage of all medications the defendant is currently taking. Such medication shall be provided to the U.S. Marshals to assure continuity of medication during the transport process.

        b. Submit the report as follows:

**ORIGINAL Report via U.S. Mail to**
U.S. District Court
Chambers of U.S. Magistrate Judge Eric J. Markovich
405 W. Congress Street, Suite 3160
Tucson, Arizona 85701;

**COPY of Report via email to**
markovich_chambers@azd.uscourts.gov

        c. Provide a copy of the written report to the medical staff at the originating facility to assure continuity of medication. For inmates returning to CCA-CADC the point of contact is Adam Kinkead and the report is to be emailed to him at **Adam.Kinkead@cca.com** upon the inmate's departure from the Federal Medical Center.

        d. If, at the conclusion of the four-month commitment, the psychologist's or psychiatrist's opinion is that the defendant remains incompetent, the defendant shall remain at the medical facility pending further order of the Court.

        e. If, at any time during the commitment, the psychologist's or psychiatrist's opinion is that the defendant is not restorable, the defendant shall remain at the medical facility pending further order of the Court, and the Attorney General or his

1 | agent shall promptly determine whether a dangerousness evaluation pursuant to 18 U.S.C.
2 | §§ 4246 and 4248 is needed, and if so, begin the evaluation.

3 |     4.    All proceedings relating to this defendant are stayed pending further order of
4 | the Court. Excludable delay under 18 U.S.C. § 3161(h)(1)(A) is found to commence on
5 | July 24, 2023, and end upon the Court's determination that the defendant is competent.
6 | Such time shall be in addition to other excludable time under the Speedy Trial Act and
7 | shall commence as of the day following the day that would otherwise be the last day for
8 | commencement of trial.

9 |     5.    **This matter is set for a status conference** on **May 13, 2025 at 9:00 a.m.,**
10 | before Magistrate Judge Eric Markovich.

11 |     6.    **The parties shall:**

12 |     a.    Upon notification of the name and contact information for the
13 | examining psychologist or psychiatrist, promptly provide that person with all relevant
14 | documents, including case reports disclosed to the defense, the defendant's criminal
15 | history, and other known mental health examinations or medical records in their
16 | possession. The parties are authorized to disclose any federal presentence investigation
17 | report(s) (PSRs) for the defendant. Any disclosed PSR shall be used solely for the purpose
18 | of this examination.

19 |     b.    By May 6, 2025, inform U.S. Magistrate Judge Eric Markovich's
20 | chambers, via email or telephone, if they have not yet received the doctor's report.

21 |     7.    The Clerk of the Court is ordered to provide this order to the U.S. Marshal
22 | Service forthwith.

Dated this 14th day of January, 2025.

*[signature]*

Eric J. Markovich
United States Magistrate Judge

cc: U.S. Marshals

- 18 -